Filed 2/5/25  Conservatorship of R.C. CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| Conservatorship of the Person and Estate of R.C. | |
| Mk.C. et al., | G061621 |
| Petitioners and Appellants, | (Super. Ct. No. 30-2017-00946366) |
| R.C., | O P I N I O N |
| Petitioner and Respondent, | |
| v. | |
| L.C. et al., | |
| Objectors and Respondents. | |

[Caption continues on next page.]

| | |
|---|---|
| Mk.C. | G061629 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 30-2018-00984697) |
| Mw.C., | |
| Defendant and Appellant, | |
| R.C. et al., | |
| Defendants and Respondents. | |
| Conservatorship of the Person and Estate of R.C. | |
| Mw.C., | G061853 |
| Petitioner and Appellant, | (Super. Ct. No. 30-2017-00946366) |
| R.C., | |
| Petitioner and Respondent, | |
| v. | |
| Mk.C. et al., | |
| Objectors and Respondents. | |

Consolidated appeals from orders of the Superior Court of Orange County, Glenn R. Salter and David L. Belz,  Judges. Nos. G061621 and G061629 affirmed as modified and with directions. Case No. G061853 affirmed. Motion to strike portions of Mw.C.'s reply brief granted.

Tucker Ellis, Edmond M. Connor, Matthew J. Fletcher; Connor, Fletcher & Hedenkamp and Douglas A. Hedenkamp for Petitioner and Appellant in Nos. G061621 and G061629, and Objector and Respondent in No. G061853, Mk.C.

Klein & Wilson, Gerald A. Klein and Gordon V. Dunn III for Petitioner and Appellant in No. G061621, Objector and Respondent in No. G061853, and Defendant and Appellant in No. 061629, Mw.C.; and Objector and Respondent in Nos. G061621 and G061853, and Defendant and Respondent in case No. G061629, L.C.

K.C., in pro. per., for Objector and Respondent in No. G061621, Objector and Respondent in No. G061853, and Defendant and Respondent in No. G061629.

Law Offices of Cheryl L. Walsh and Cheryl L. Walsh for Petitioner and Respondent in Nos. G061621 and G061853, and Defendant and Respondent in No. G061629, R.C.

\* \* \*

## INTRODUCTION

The record in this appeal is massive, the briefs are extraordinarily long, and various issues of both substantive and procedural nature are presented for our resolution. But when all is said and done, this matter comes down to whether the evidence presented at trial supports the trial court's findings that R.C. had the mental capacity to execute a series of documents—including a trust amendment, powers of attorney, and the exercise of a power of appointment—and that she was not subject to undue influence when she did so. As we shall explain, the great weight of evidence supports those findings.

3

R.C.'s oldest child, Mk.C., initiated this litigation by filing a petition for the appointment of a conservator of the person and estate of his mother, R.C. Several months later, Mk.C. used his power of attorney to bring a lawsuit on R.C.'s behalf for elder abuse against his siblings, Mw.C. and K.C. Furious at Mk.C. for bringing those lawsuits and for his treatment of her, R.C. signed a revocation of the power of attorney used by Mk.C. and a new power of attorney appointing Mw.C. as her sole agent.

After Mk.C. brought a trust petition to have the new power of attorney declared invalid, R.C. executed several documents by which she in effect disinherited Mk.C. and appointed Mw.C. as sole trustee of several family trusts. Mk.C. amended his petition to challenge the validity of those documents on the grounds they were procured by undue influence and R.C. lacked mental capacity to sign them. Mw.C. brought a petition within the conservatorship action to uphold the validity of the power of attorney appointing him to be R.C.'s sole agent.

Following a bench trial, the trial court upheld the validity of the documents challenged. The court found that R.C. had the requisite mental capacity, was not subject to undue influence, and made her decisions based on her own free will. The court also found that Mk.C. had failed to shift the initial burden of proof to Mw.C.

Mk.C. appealed. He contends: (1) the trial court misallocated the burden of proving undue influence; (2) the trial court misallocated the burden of proving lack of mental capacity; (3) the trial court's statement of decision is deficient; (4) the trial court's errors were prejudicial; (5) the trial court erred by failing to enter a statement of decision in the conservatorship; and (6) the trial court erred by adjudicating the validity of documents that were not in issue.

4

Our discussion below begins with the last contention. We agree with Mk.C. that the trial court erred by adjudicating the validity of five documents which had been removed from the court's consideration by the end of trial. Our analysis and review are limited therefore to six documents. Moving backwards on the list of contentions, we also agree with Mk.C. that the statement of decision should have been filed in the Conservatorship Proceeding, Orange County Superior Court Case No. 30-2017-00946366, and shall direct the trial court to do so on remand.

Mk.C. argues the trial court's statement of decision is deficient because it fails to make findings on the principal issues presented. We conclude the trial court's statement of decision is satisfactory. The statement of decision fairly discloses the trial court's decision on undue influence and mental capacity to make a will or enter into a contract—the two ultimate facts presented—and resolves Mk.C.'s proposed findings of fact.

This brings us to what is the heart of this matter: Whether the evidence supports the trial court's findings on mental capacity and undue influence. For purposes of analysis, we shall assume the trial court misallocated the initial burden of proof on mental capacity and undue influence, as Mk.C. asserts. Error in allocating the burden of proof in a bench trial is harmless if the trial court's findings are supported by substantial evidence. Mk.C. advocates for a higher standard under which we must consider the weight of the evidence in determining whether error in misallocating the burden of proof is prejudicial. Even under that standard, any error in misallocating the burden of proof was harmless because the great weight of the evidence supports the trial court's findings R.C. had the requisite mental capacity and was not subject to undue influence.

5

Mw.C. also appealed in order to challenge an order granting Mk.C.'s motions to strike cost memoranda in the conservatorship matter. Mw.C. argues he was entitled to costs as a matter of right under Code of Civil Procedure section 1032 because he was the prevailing party. Not so. The trial court had discretion under Probate Code section 1002, which governs the award of costs in proceedings under the Probate Code, and exercised that discretion by striking from the proposed judgment a finding that Mw.C. and R.C. were the prevailing parties and entitled to costs. As Mw.C. was not awarded costs, the trial court did not err by striking his costs memorandum.

IDENTIFICATION OF DOCUMENTS

Before we present a statement of facts, we identify eleven documents signed by R.C. that play a significant role in this case. Those documents are:

1.  Durable Power of Attorney for Assets for R.C., dated February 28, 2018. We refer to this document as the February 2018 Power of Attorney.

2.  Revocation of Power of Attorney, dated February 28, 2018. We refer to this document as the February 2018 Revocation.

3.  Fifth Amendment to R.C. Trust (the Survivor's Trust),[1] dated May 30, 2018. We refer to this document as the Fifth Trust Amendment.

4.  Exercise of Power of Appointment, dated May 30, 2018. We refer to this document as the May 2018 Exercise of Power of Appointment.

---

[1] In trust documents, the Survivor's Trust is sometimes referred to as the R.C. Trust. We use the term the Survivor's Trust.

5. Resignation of Trustee and Appointment of Successor Trustee, dated May 30, 2018 as to the Survivor's Trust. We refer to this document as the May 2018 Survivor's Trust Resignation and Appointment.

6. Resignation of Trustee and Appointment of Successor, dated May 30, 2018 (as to the Family Trust and Marital Trust). We refer to this document as the May 2018 Family Trust Resignation and Appointment.

7. Third Amendment to the Survivor's Trust, dated January 23, 2017. We refer to this document as the Third Trust Amendment.

8. Advance Health Care Directive, Authorization for Disclosure and Use of Protected Health Information, and Uniform Statutory Form Power of Attorney, each dated August 31, 2017. We refer to these documents collectively as the August 2017 Advance Health Care Directive.

9. Fourth Amendment to the Survivor's Trust, dated September 6, 2017. We refer to this document as the Fourth Trust Amendment.

10. Revocation of Advance Health Care Directive and Revocation of Power of Attorney, each dated September 29, 2017. We refer to these documents collectively as the September 2017 Revocation.

11. Advance Health Care Directive and Revocation of Powers of Attorney, each dated January 16, 2018. We refer to these documents collectively as the January 2018 Advance Health Care Directive and Revocation.

Sometimes we refer to these documents (or groups of documents) by number rather than by name (e.g. documents Nos. 1–6; document No. 3 instead of the Fifth Trust Amendment). In the trial court's statement of decision and other documents in the record, the February 2018 Power of Attorney and the February 2018 Revocation are treated as a single document,

as are the May 2018 Survivor's Trust Resignation and Appointment and the May 2018 Family Trust Resignation and Appointment. We treat these as four separate documents.

FACTS AND PROCEDURAL HISTORY[2]

I.

THE C. FAMILY ESTATE PLAN

R.C. and her husband Mo.C. had three children: Mk.C., Mw.C., and K.C. Mk.C. is the oldest child. Mw.C. is married to L.C. Mo.C. died in December 2014. We use the term Respondents when referring to R.C., Mw.C., K.C., and L.C. collectively.

Mo.C. and R.C.'s original estate plan was set forth in The Mo.C. and R.C. Living Trust, created on October 21, 1997 (the Trust). When Mo.C. died in 2014, the Trust was divided into three subtrusts: (1) the Survivor's Trust; (2) the Marital Trust; and (3) the Family Trust. All of these documents were prepared by Richard Albrecht, who was Mo.C. and R.C.'s longtime estate planning attorney.

II.

C. BOLT, INC.

R.C.'s family derived its wealth from C. Bolt, Inc. (C. Bolt) a company founded by R.C. and Mo.C. in 1975. C. Bolt was highly profitable and made Mo.C. and R.C. very wealthy. R.C. was proud of C. Bolt's success and of what she and Mo.C. had accomplished. She identified herself with C. Bolt and, late into her life, went to her office at C. Bolt on Monday through Friday because it gave her pleasure.

---

[2] In accordance with the usual rules on appeal following a bench trial, we view the facts in the light most favorable to trial court's decision. (*Blanks v. Seyfarth Shaw LLP* (2009) 171 Cal.App.4th 336, 346, fn. 2.)

In December 2011, Mo.C. and R.C. gave Mk.C. and Mw.C. each 49.5 percent of the nonvoting shares of C. Bolt. Mo.C. and R.C. retained one percent of the nonvoting shares and 100 percent of the voting shares. K.C. received nothing. By retaining all voting shares, Mo.C. and R.C. retained control of C. Bolt. At about the time these gifts were made, Mk.C. became the president of C. Bolt.

In 1979, Mo.C. and R.C. had formed a company in Colorado called Centennial Bolt, Inc. (Centennial Bolt). Mk.C. purchased a 24 percent interest in Centennial Bolt. Around the year 2000, Mk.C. obtained 100 percent of Centennial Bolt shares through gifts made to him from Mo.C. and R.C. Sometime before 2014, Mo.C. and R.C. decided to make a gift to Mw.C. of $618,958 to equalize the gift to Mk.C. of Centennial Bolt shares. After Mo.C. died, R.C. still wanted to make the equalizing gift to Mw.C., even though she knew the gift would displease Mk.C., which it did. Mk.C. believed the gift to Mw.C. was procured by undue influence.

### III.

### FAMILY DISPUTES

In 2015, R.C. began discussions with Albrecht about disinheriting K.C. R.C. wanted to disinherit K.C. apparently because R.C. believed that K.C. had been unkind to her and did not treat her "properly." Albrecht tried to dissuade R.C. from disinheriting K.C. but she was steadfast, and he acceded to her wishes.

In February 2016, R.C. disinherited K.C. by means of the First Amendment to the Survivor's Trust, which removed K.C. as a trust beneficiary. At the same time, R.C. executed a new power of attorney (the 2016 Power of Attorney), which designated Mk.C. and Mw.C. as co-agents to manage her affairs.

9

The years 2016 and 2017 mark a period of intense conflict among Mk.C., Mw.C., and K.C. Matters came to a head on May 20, 2017. At that time, Mk.C. had been living with R.C. part time for several years to help take care of her. According to Mw.C., R.C. and K.C. were in the process of reconciling—which Mk.C. did not like inasmuch as he had long had a hostile relationship with K.C. Upon returning to R.C.'s house on May 20, Mk.C. saw K.C.'s car and exploded in anger. Mk.C. demanded that R.C. choose between him and K.C. When R.C. refused, Mk.C. abandoned R.C. and left K.C. and Mw.C. to serve as her primary caretakers.

In May 2018, R.C. restored K.C. to her inheritance.

IV.

THE CONSERVATORSHIP PROCEEDING

R.C. began experiencing short term memory loss in about 2016. R.C. was sensitive about her memory loss, which Mk.C. called R.C.'s "dirty little secret." In September 2016, R.C.'s primary care physician, Karen Lau, M.D., who had been treating R.C. for memory loss, referred her to neuropsychiatrist Gustavo Alva, M.D., for follow up testing. By February 2017, Dr. Lau believed that R.C. might have "mild dementia." In August 2017, Dr. Lau diagnosed R.C. as having "mild cognitive impairment" and "presenile dementia, with behavioral disturbance."

In September 2017, Mk.C. filed a petition for appointment of a conservator of the person and estate of R.C. (the Conservatorship Petition). We refer to the superior court case initiated by the Conservatorship Petition as the Conservatorship Proceeding. Mk.C. sought an order that (1) "[R.C.] lacks capacity to enter into any transactions related to the family business," (2) "[Mk.C.] shall have the right to avoid any transaction made by [R.C.] from September 2016 through the date of the Order," (3) "[Mk.C.] [may] determine

10

the appropriate level of care for [R.C.]," (4) "[Mk.C.] has the authority to give consent to any necessary medical treatment for [R.C.]," and (5) "[Mk.C.] have the authority to execute estate planning documents for and on behalf of [R.C.]."

R.C. was served with the Conservatorship Petition at her beauty salon and was, not surprisingly, furious. R.C.'s anger at Mk.C. did not subside over time. R.C. told Albrecht that she was angry at Mk.C. for bringing the Conservatorship Petition and that she did not want Mk.C. to control her financial and personal decisions.

In support of the Conservatorship Petition, Mk.C. submitted two capacity declarations—one from Dr. Lau and the other from Dr. Alva—which concluded that R.C. lacked the capacity to give informed consent to any medical condition. Dr. Alva found that R.C. had "moderate" to "major" impairments in 13 areas of cognitive ability and in eight areas of ability to modulate mood and affect. Dr. Lau found R.C. had "moderate" to "major" impairments in eight areas of cognitive ability. Based on those declarations, Mk.C. contended that R.C. was incapacitated within the meaning of the Trust and, for that reason, requested Mw.C. to agree that he and Mk.C. assume their positions as successor co-trustees. Mw.C. denied that R.C. was incapacitated and declined Mk.C.'s request.

Attorney Cheryl Walsh represented R.C. in the Conservatorship Proceeding. Frances Diaz, an attorney and L.C.'s sister, considered herself to be part of R.C.'s legal team. Diaz was a sole practitioner and worked from home, with no employees or staff, and had a caseload of only a few cases. Diaz had known the C. family since she was a small child, and, after learning of the Conservatorship Proceeding, wanted to help R.C. "in any which way [she] could."

11

Diaz was hostile to Mk.C. and as early as October 2017 insisted that R.C. disinherit him. Diaz's insistence had no effect. Walsh testified that neither she nor R.C. did anything to remove Mk.C. from R.C.'s estate in response to Diaz's demands; as Walsh testified, "I don't take direction from [Diaz]."

In January 2018, Mk.C. deposed R.C. in the Conservatorship Proceeding. R.C., who was 85 or 86 years old at the time, was very angry about the deposition and angry at Mk.C. for bringing the Conservatorship Proceeding. The substance of R.C.'s testimony is addressed *ante*, in part III.C.2 of the discussion section pertaining to Mk.C.'s appeal. A few points suffice here. When asked if she knew why she was being deposed, R.C. responded: "Because my son has me here. [Mk.C.] has me here. [¶] . . . [¶] I'm sure because [Mk.C.] wants to take over control of me. [¶] . . . [¶] Control of everything that I own and everything that I have." R.C. testified that Mk.C. was a bully, yelled at her, and called her a bitch.

V.

COURT-APPOINTED INVESTIGATOR

In the Conservatorship Proceeding, the court appointed Dalton Diaz[3] to be the court-appointed investigator. His task as a court-appointed investigator was to verify information in the Conservatorship Petition and to make a recommendation as to whether a conservatorship was necessary. He interviewed R.C. twice.

The court investigator met privately with R.C. in February 2018. He concluded that R.C. understood the purpose of his visit and found her to

---

[3] We refer to Dalton Diaz as the court investigator to avoid confusion with Frances Diaz.

be groomed appropriately and throughout the interview to be alert, present, and able to answer his questions. The court investigator saw no evidence that Mw.C. was trying to coach R.C. or that she was being influenced to answer questions in a particular way.

R.C. told the court investigator she wanted Mw.C. to be her conservator if she had to have one. R.C. told the court investigator she did not want Mk.C. to be her conservator because "[Mk.C.] is a very selfish and greedy person. He is only doing that because he wants to get it all." R.C. said that Mk.C. rarely visited her and, when he did, the visits were "tense and uncomfortable." R.C. told the court investigator that "[Mk.C.] is very loud and threatening when he doesn't get what he wants" and that "[Mk.C.] will curse at me, he's called me a bitch many times."

At the conclusion of the interview, the court investigator found that R.C. could make her own medical decisions, did not seem confused, fully understood the nature of the Conservatorship Proceeding, and did not want a conservatorship or Mk.C.'s appointment as a conservator. The court investigator found that the allegations of the Conservatorship Petition were unsupported and recommended against a conservatorship.

The court investigator privately interviewed R.C. again on July 12, 2019. R.C. again told him that she did not want a conservator. He found that R.C.'s short-term memory had notably diminished since he saw her in February 2018, but her long-term memory seemed to be intact and she could still converse with him. The court investigator concluded that R.C. still did not want Mk.C. as her conservator and that R.C. still did not need a conservatorship.

13

## VI.

### CHANGES TO POWER OF ATTORNEY AND
### ESTATE PLANNING DOCUMENTS

In February 2018, Mk.C. used his power of attorney to file a lawsuit against K.C. and Mw.C. for elder abuse on R.C.'s behalf. R.C. was upset that Mk.C. was suing K.C. and Mw.C. and did not want him to sue them on her behalf. Walsh advised R.C. that if she did not want Mk.C. to file lawsuits on her behalf, she could revoke the power of attorney she had given him. R.C. decided to do just that.

On February 28, 2018, R.C. signed the February 2018 Revocation in order to revoke the 2016 Power of Attorney, which had named Mk.C. and Mw.C. as co-attorneys-in-fact. Also on February 28, 2018, R.C. signed the February 2018 Power of Attorney, which appointed Mw.C. to be R.C.'s sole attorney-in-fact. Walsh explained to R.C. the meaning and effect of the February 2018 Revocation and the February 2018 Power of Attorney before she signed those documents. R.C. understood the purpose of a power of attorney and did not indicate to Walsh any lack of understanding about the documents she had signed.

Soon after R.C. signed the February 2018 Revocation and the February 2018 Power of Attorney, Mk.C. withdrew the elder abuse lawsuit at Walsh's request.

In a meeting with Walsh on March 14, 2018, R.C. said she wanted to leave Mk.C. $1 because "[h]e doesn't care what he does to others or hurts me." Walsh recommended to R.C. that she meet with Albrecht and contacted Albrecht herself to tell him that R.C. wanted to discuss estate planning changes with him.

14

## VII.

### THE TRUST PROCEEDING

In April 2018, Mk.C. filed a petition for removal of trustee and successor trustee (the Trust Petition). We refer to the superior court case initiated by the Trust Petition as the Trust Proceeding. As relief, Mk.C. sought orders that: (1) R.C. could no longer serve as a trustee of the Trust or any of the three subtrusts; (2) R.C. be removed as trustee based on lack of capacity; (3) Mw.C. be removed as trustee and Mk.C. be the sole successor trustee; and (4) costs associated with the petition be charged to the trust and not to Mk.C.'s share.

Mk.C. filed an amended petition for instructions in December 2018. In a third amended prayer, filed in February 2021, he sought an order declaring documents Nos. 1–6, 8, and 11 to be invalid because R.C. lacked capacity to sign them or was unduly influenced to do so.

## VIII.

### R.C. DISINHERITS MK.C.

R.C. was upset that Mk.C. had brought the Trust Proceeding to remove her as trustee. R.C. told her geriatric care manager, Marla Feldman, that she was furious with Mk.C. for the legal fees the family incurred in fighting all of Mk.C.'s lawsuits. R.C. came to the belief, however, that it was time for her to step down as trustee—so long as Mw.C. alone would be the successor trustee.

On April 27, 2018, R.C. met with Albrecht and told him she wanted to disinherit Mk.C. Diaz prepared instructions for R.C. to use at the meeting and drove R.C. to Albrecht's office. One instruction was to tell Albrecht, "please remove [Mk.C.]'s name and his children from my estate

15

planning documents that you prepared when my husband was alive and after his death."

After R.C. explained that she wanted to disinherit Mk.C., Albrecht proposed other options (such as 50 percent to Mw.C. and 25 percent each to Mk.C. and K.C.) and suggested to R.C. that she think over the decision. At that time, Albrecht believed that R.C., though sometimes forgetful, had testamentary capacity to make the decision to disinherit Mk.C. Albrecht did not want to consult with R.C. regarding changes in her estate plan because he had represented both R.C. and Mk.C. By the time of the meeting, Albrecht believed the situation "was getting messy" and was uncomfortable getting further involved in R.C.'s estate planning.

On May 9, 2018, R.C., accompanied by Frances Diaz, met with H. Neal Wells III, a prominent estate planning attorney and a member of the American College of Trust and Estate Counsel. Wells noted that R.C. was "sharp as a tack" and "asked numerous questions about what we were going to do and why, thereby evidencing that she grasps the situation." R.C. told Wells that she was "exceedingly upset" with Mk.C. because he had sued to impose a conservatorship on her and to "kick her out as trustee of the [Trust]." Wells's notes include a list of reasons R.C. gave for why she wanted to disinherit Mk.C. Those reasons included "[h]is bringing the conservatorship proceedings against [R.C.]" and "[t]he subjecting of [R.C.] to the expenses of the conservatorship proceedings including the deposition of [R.C.] and others."

Wells's notes from the May 9, 2018 meeting reflect that "[R.C.] is having Frances Diaz assist her in [ ]order to be a storehouse of legal information and to be able to communicate matters to [Mw.C.] and [K.C.]." At this meeting on May 9, 2018, Diaz did not give Wells any instructions. After

16

the meeting on May 9, Wells spoke with or e-mailed Diaz about nine times while he was preparing the documents and sent drafts of the documents to her. Wells did not let Diaz participate in the preparation of any estate planning documents; he took no instruction from Diaz, and "what was done were [his] recommendations to [R.C.] and were [his] handiwork."

Based upon R.C.'s expressed wishes, Wells prepared (1) the Fifth Trust Amendment, (2) the May 2018 Exercise of Power of Appointment, (3) the May 2018 Survivor's Trust Resignation and Appointment, and (4) the May 2018 Family Trust Resignation and Appointment.

The Fifth Trust Amendment removed "any and all restrictions upon the resignation of [R.C.] as Trustee, or her appointment of a Successor Trustee" and "all provisions thereof respecting the determination of capacity of [R.C.]." By means of the two resignations of trustee and appointment of successor trustee (documents Nos. 5 and 6), R.C. resigned as trustee and appointed Mw.C. as sole successor trustee of the Survivor's Trust, the Marital Trust, and the Family Trust. By means of the May 2018 Exercise of Power of Appointment, R.C. in effect disinherited Mk.C. by directing that upon her death all personal property and residue of the Survivor's Trust be distributed to Mw.C. and K.C. and all of the C. Bolt voting stock held in the Survivor's Trust be distributed to Mw.C.

On May 30, 2018, Diaz drove R.C. to Wells's office for her to review and sign documents. Diaz was silent throughout the meeting. Wells reviewed the documents with R.C. and explained the effect of each. R.C. then signed the Fifth Trust Amendment, the May 2018 Exercise of Power of Appointment, the May 2018 Survivor's Trust Resignation and Appointment, and the May 2018 Family Trust Resignation and Appointment. Wells had no doubt that R.C. had capacity to execute those documents, saw no indication

17

that R.C. was unduly influenced to execute them, and had no reason to believe the changes made to R.C.'s estate plan were anything other than the product of her own free will.

## IX.

### TRIAL AND STATEMENT OF DECISION

In November 2018, Mk.C. filed an amended petition in the Trust Proceeding to challenge on grounds of undue influence and lack of capacity the validity of the following documents signed by R.C.: (1) the February 2018 Power of Attorney; (2) the February 2018 Revocation; (3) the Fifth Trust Amendment; (4) the May 2018 Exercise of Power of Appointment; (5) the May 2018 Survivor's Trust Resignation and Appointment; and (6) the May 2018 Family Trust Resignation and Appointment.

Also in November 2018, R.C. and Mw.C. filed a petition in the Conservatorship Proceeding by which they sought a determination that R.C. had revoked the 2016 Power of Attorney and that the February 2018 Power of Attorney was valid and in full force and effect. Mk.C. filed an amended petition for appointment of a conservator in September 2019 but then requested dismissal of the Conservatorship Petition without prejudice in April 2021, on the eve of trial.

R.C. and Mw.C.'s petition in the Conservatorship Proceeding and Mk.C.'s first amended petition in the Trust Proceeding were bifurcated for trial, with the validity of the challenged documents to be addressed in the first phase. Other issues would be addressed in a second phase, if necessary. The Conservatorship Proceeding and the Trust Proceeding were either

18

consolidated for trial or tried together as related cases for the first phase of trial.[4]

A bench trial before Judge Salter began on May 3, 2021. Closing arguments concluded on July 2. Trial lasted nine weeks.

In November 2021, the trial court issued a tentative statement of decision in favor of Respondents. The trial court signed the final statement of decision on April 22, 2022. In the statement of decision, the trial court made two primary findings: (1) "[R.C.] Had Mental Capacity to Execute the Contested Documents" and (2) "[R.C.] Was Not Subject to Undue Influence When She Executed the Contested Documents." (Underscore omitted.) The court also found that Mk.C. had failed to overcome the presumptions of capacity and lack of undue influence.

## X.

### "JUDGMENTS" AND APPEALS

In the Conservatorship Proceeding, a judgment (the Conservatorship Judgment)[5] was entered which adjudged that R.C. had

---

[4] The trial court orally ordered a bifurcated trial, but no formal order of bifurcation appears in the record. Although no consolidation order appears in the record, the parties have treated the Conservatorship Proceeding and the Trust Proceeding as having been consolidated for the first phase of trial. The trial court's statement of decision refers to the Conservatorship Proceeding and the Trust Proceeding as "related matters," not consolidated cases.

[5] Judgments are not used in trust and conservatorship proceedings: Probate and conservatorship courts issue final orders, not judgments. Such final orders are made appealable by Probate Code sections 1300 through 1304 and Code of Civil Procedure section 904.1, subdivision (a)(10). We treat the "judgments" entered in this case as final orders made appealable by Probate Code sections 1300, subdivisions (c) and (g), 1302, 1302.5, and/or 1304, subdivision (a). (See *Estate of Stoddart* (2004)

19

mental capacity and was not acting under undue influence when she executed documents Nos. 1, 2, 8, 10, and 11, that is, the February 2018 Power of Attorney (document No. 1), the February 2018 Revocation (document No. 2), the August 2017 Advance Health Care Directive (document No. 8), the September 2017 Revocation (document No. 10), and the January 2018 Advance Health Care Directive and Revocation (document No. 11). The final statement of decision was filed in the Trust Proceeding but, apparently due to clerical error, was not filed in the Conservatorship Proceeding.

In the Trust Proceeding, a "Judgment on Phase One Issues" (the Trust Judgment) was entered which adjudged that R.C. had mental capacity and was not acting under undue influence when she executed documents Nos. 3–7 and 9, that is, the Fifth Trust Amendment (document No. 3), the May 2018 Exercise of the Power of Appointment (document No. 4), the May 2018 Survivor's Trust Resignation and Appointment (document No. 5), the May 2018 Family Trust Resignation of Trustee and Appointment (document No. 6), the Third Trust Amendment (document No. 7), and the Fourth Trust Amendment (document No. 9).

After entry of the Conservatorship Judgment, Mw.C., L.C., and R.C. filed cost memoranda in the Conservatorship Proceeding and the Trust Proceeding. The trial court granted Mk.C.'s motions to strike those costs memoranda.

Mk.C. filed a notice of appeal from the Conservatorship Judgment and a separate notice of appeal from the Trust Judgment. Mk.C.'s appeals were respectively assigned Nos. G061621 and G061629. Mw.C. filed a notice of second appeal in No. G061621, and Mw.C. and L.C. filed a notice of

115 Cal.App.4th 1118, 1125.) We continue to refer to the judgments as such to avoid confusion.

20

second appeal in No. G061629. Mw.C. and L.C. filed a notice of appeal from the order in the Trust Proceeding granting Mk.C.'s motions to strike cost memoranda. Mw.C. later filed a notice of appeal from the order in the Conservatorship Proceeding granting Mk.C.'s motions to strike cost memoranda. Mw.C. and L.C.'s appeal was assigned No. G061754, and Mw.C.'s appeal was assigned No. G061853. All appeals were consolidated for all purposes with No. G061621 as the lead case. Mw.C. and L.C. subsequently abandoned Nos. G061629 and G061754.

DISCUSSION: Mk.C.'s APPEAL

I.

THE VALIDITY ONLY OF DOCUMENTS NOS. 1–6 WAS<br>BEFORE THE TRIAL COURT

Mk.C. contends the trial court erred by adjudicating the validity of documents Nos. 7–11 because they had been removed from the court's consideration. We agree. Only documents Nos. 1–6 and 8 were listed in the third amended prayer to Mk.C.'s Trust Petition. Before trial, the parties filed a joint statement of controverted issues for phase one. The joint statement expanded the documents to be adjudicated beyond those presented by Mk.C.'s third amended prayer by adding documents Nos. 7 and 9–11.

After trial, and at the court's request, each side prepared and submitted a list of controverted issues to be decided by the court. Mw.C.'s counsel prepared and submitted a "Summary of Differences Between Competing Lists of Controverted Issues to Be Decided by the Court for Phase One of Trial" which presented a side-by-side comparison of the two lists. Documents Nos. 7–11 do not appear on this summary of differences.

According to Mk.C., the omission from the summary of differences of documents Nos. 7–11 shows that issues regarding those documents had been resolved by the end of trial and removed from the court's

21

consideration. That is, we believe, the most plausible interpretation of the summary of differences. At the end of trial, neither side identified issues regarding the validity of documents Nos. 7–11 as controverted. Mw.C. agrees that "[Mk.C.] strategically withdrew his challenges to these documents during trial." Mk.C. did not induce error, as Mw.C. claims, because both his and Mk.C.'s posttrial lists of controverted issues and the summary of those lists apprised the court of which documents remained in controversy.

Accordingly, in the disposition we shall direct the trial court to prepare and file amended statements of decisions and judgments deleting documents Nos. 7–11 from adjudication.

II.

THE STATEMENT OF DECISION IS SUFFICIENT

Mk.C. challenges the sufficiency of the trial court's statement of decision on the ground the trial court failed to make findings on the principal controverted issues in the case. We conclude the statement of decision was sufficient.

In the statement of decision, the trial court first identified the matters before it and then provided a summary of facts and evidence. In this summary, the court found the video recording of R.C.'s deposition to be "very instructive in making the critical determinations here" and "corroborated Dr. Olsen's conclusions that [R.C.] had capacity at the relevant times and was able to resist undue influence." Following the summary is a section entitled "Findings of Fact and Conclusions of Law" in which the court made two core findings: (1) "[R.C.] Had Mental Capacity to Execute the Contested Documents" and (2) "[R.C.] Was Not Subject to Undue Influence When She Executed the Contested Documents." (Underscore omitted.) The trial court identified the "contested documents" as documents Nos. 1–11 (the court used

22

nine document titles instead of 11). After each primary finding, the trial court discussed the law and evidence. The court expressly found that Mk.C. had failed to overcome the presumptions of capacity and lack of undue influence.

"The primary purpose of a statement of decision is to facilitate appellate review." (*People v. Landlords Professional Services, Inc.* (1986) 178 Cal. App. 3d 68, 70.) "'The court's statement of decision is sufficient if it fairly discloses the court's determination as to the ultimate facts and material issues in the case.'" (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 983.)

"'[T]he term "ultimate fact" generally refers to a core fact, such as an essential element of a claim.' [Citation.] 'Ultimate facts are distinguished from evidentiary facts and from legal conclusions.' [Citation.] Thus, a court is not expected to make findings with regard to 'detailed evidentiary facts or to make minute findings as to individual items of evidence.'" (*Thompson v. Asimos, supra*, 6 Cal.App.5th at p. 983.) "'[T]he trial court is not required to respond point by point to the issues posed in a request for statement of decision.'" (*Ibid.*)

Mk.C. argues the two core findings made by the trial court are legal conclusions and not findings of ultimate fact. In his proposed findings filed in the trial court, Mk.C. identified thirteen issues which, he contends, are the ultimate facts which should have been addressed in the statement of decision. The statement of decision is deficient, he contends, because it does not address those ultimate issues.

The trial court's finding that R.C. had mental capacity to execute documents Nos. 1–11 is a mixed finding of law and fact. (*In re Sexton* (1926) 199 Cal. 759, 769–770; *In re Estate of Perkins* (1925) 195 Cal. 699, 710.) A mixed question of law and fact is one in which a rule of law is applied to a set of facts as found by the trier of fact. (*Crocker National Bank v. City and*

23

*County of San Francisco* (1989) 49 Cal.3d 881, 888.) A finding on a mixed question of law and fact may also constitute a finding on an ultimate fact. (*In re Estate of Hill* (1914) 167 Cal. 59, 62–63 [finding that a person is an owner of property is both a finding on a mixed question of fact and law and a finding of ultimate fact].)

Mental capacity to make a will, enter into a contract, or transact affairs is an ultimate fact. (*In re Estate of Gould* (1922) 188 Cal. 353, 365; *Riperdan v. Weldy* (1906) 149 Cal. 667, 673; *Phillips v. Standard Acc. Ins. Co.* (1960) 180 Cal.App.2d 474, 482; see *Goldman v. Goldman* (1959) 169 Cal.App.2d 103, 104 [a finding that defendant "was of unsound mind" to enter into a marriage was a finding of ultimate fact].) In *In re Estate of Benton* (1901) 131 Cal. 472, 474–475, the California Supreme Court explained: "There appears to be some doubt in the minds of counsel in this case, and also in the mind of the trial court, as to the character of the issues which may or should be presented to the jury in a case of this kind. Yet in view of the provisions of sections 1312 and 1314 of the Code of Civil Procedure, we see no reason for doubt as to the proper procedure to be followed; as, for example, in this case, counsel and court may have submitted to the jury the question: 1. Was the decedent competent to make a last will and testament? 2. Was the mind of the decedent, at the time of the execution of the will, free from fraud practiced upon him by Herbert A. Benton? *These were the ultimate facts in the case.*" (Italics added.)

Likewise, the trial court's finding that R.C. was not subject to undue influence when she executed documents Nos. 1–11 was a finding of ultimate fact. (*In re Estate of Bixler* (1924) 194 Cal. 585, 590; *Estate of Benton, supra*, 131 Cal. at pp. 475–476; see *In re Estate of Berry* (1925) 195 Cal. 354, 361 ["The existence of such relation would be a circumstance

24

relevant to . . . the issue of ultimate fact whether the will was the product of undue influence"]; *Krug v. Meeham* (1952) 109 Cal.App.2d 274, 278 ["the allegations of the second amended complaint do, without resort to the conclusions of law, allege the ultimate fact that the conveyances were procured by the undue influence of defendant"]; *In re Estate of Graves* (1927) 202 Cal. 258, 263 [allegations of complaint, "'without recourse to conclusions of law, allege[d] the ultimate fact that the will was the product of the undue influence of the person charged'"].)

A finding on an ultimate fact "encompasses findings on all intermediate evidentiary facts necessary to sustain it." (*McGaughey v. Fox* (1979) 94 Cal.App.3d 645, 649.)

Although the trial court did not expressly respond to Mk.C.'s proposed findings,[6] most of them were resolved by the statement of decision

---

[6] The findings proposed by Mk.C., which are found at pages 69–71 of his appellant's opening brief, were:

"[1]. Was [R.C.] vulnerable to undue influence, and were the influencers aware of that vulnerability (Welfare & Institutions Code section 15610.70(a)(1))?

"[2]. Did Frances Diaz, [Mw.C.], [K.C.], and [L.C.] have apparent authority over [R.C.] (Welfare & Institutions Code section 15610.70(a)(2))?

"[3]. Did the actions or tactics used by Frances Diaz, [Mw.C.] , [K.C.], and [L.C.] amount to excessive persuasion (Welfare & Institutions Code section 15610.70(a)(1))?

"[4]. Did the result of the challenged documents diverge from [R.C.]'s intent so as to render them inequitable? (Welfare & Institutions Code section 15610.70(a)(4))?

"[5]. In light of the foregoing factors, did [Mk.C.] prove by clear and convincing evidence that the challenged documents were procured as a result of undue influence?

25

or encompassed by a finding on an ultimate fact, and the rest are legal issues or unnecessary to the trial court's decision.

Mk.C.'s proposed findings Nos. 1–3 are resolved at page 6, lines 11–14 and 22–27 of the statement of decision. Proposed finding No. 4 is resolved at page 6, lines 11–17. Proposed finding No. 5 is resolved at page 5, lines 19–21 and by the finding the challenged documents were not procured by undue influence. Proposed findings Nos. 6 and 7 are resolved at page 5,

---

"[6]. Is there a rebuttable presumption that any of the [c]hallenged [d]ocuments were procured as the result of undue influence?

"[7]. Did the Respondents rebut the presumption of undue influence?

"[8]. Is [Mk.C.] barred from recovery based on unclean hands or other affirmative defense?

"[¶] . . . [¶]

" . . . [9]. Are the [c]hallenged [d]ocuments more complicated than a will or codicil?

"[10]. Was the presumption of capacity reversed or neutralized pursuant to Civil Code § 39(b)?

"[11]. Under the applicable standard of capacity, including Probate Code 4120 and for appointing an agent, and applying the applicable presumption, did [R.C.] have capacity to execute each of the [c]hallenged [d]ocuments?

"[12]. Should any [c]hallenged [d]ocuments be rescinded or invalidated due to lack of capacity?

"[13]. Is Mk.C. barred from recovery under this claim based on the doctrine of unclean hands or other affirmative defenses?"

26

lines 15–21 and page 6, lines 22–27 and by the court's finding that the contested documents were not procured by undue influence. Proposed findings Nos. 8 and 13 are unnecessary because, based on the trial court's findings, the court did not need to resolve the unclean hands defense or any of Mw.C.'s affirmative defenses. Proposed finding No. 9 is a legal issue that is subsumed within the trial court's finding of capacity. (*Pallco Enterprises, Inc. v. Beam* (2005) 132 Cal.App.4th. 1482, 1501 [statement of decision is not required to resolve all questions of law].). Proposed finding No. 10 is resolved at page 4, lines 7–10. Proposed finding No. 11 is partly a legal issue and the factual component is resolved at page 4, lines 4–11. (*Ibid.*) Proposed finding No. 12 is resolved at page 4, lines 1–11 and by the finding that R.C. had the mental capacity to execute the challenged documents.

The statement of decision serves its purpose. It explains the trial court's reasoning, fairly discloses the court's determination of the ultimate facts and material issues, and provides the factual and legal basis for the court's decision. No more was required.

## III.

### ANY ERROR IN ALLOCATING THE BURDEN OF PROOF WAS HARMLESS

A. *Burdens of Proof for Mental Capacity and Undue Influence*

The trial court found that "[u]nder the evidence received by the court, [Mk.C.] was unsuccessful in shifting the burden of proof to [Mw.C.], [K.C.] or [L.C.]." Mk.C. contends the trial court erred by so finding and by failing to shift to Mw.C. the burden of proof of mental capacity and undue influence with respect to Diaz.

27

A person challenging a testamentary instrument bears the burden of proving lack of mental capacity and undue influence. (Prob. Code, §§ 810, subd. (a), 8252; *Rice v. Clark* (2002) 28 Cal.4th 89, 96–97; *Estate of Fritschi* (1963) 60 Cal.2d 367, 372.) A presumption of lack of mental capacity to contract arises, however, upon a showing that "the person is substantially unable to manage his or her own financial resources or resist fraud or undue influence." (Civ. Code, § 39, subd. (b); see *Algo-Heyres v. Oxnard Manor LP* (2023) 88 Cal.App.5th 1064, 1071.) "When this presumption applies, the party claiming capacity to contract has the burden 'to prove that while he or she may be unable to manage his or her financial resources or resist fraud or undue influence, he or she is nevertheless still capable of contracting being of sound mind as defined by Probate Code section 811.'" (*Algo-Heyres, supra*, at p. 1071.)

A presumption of undue influence arises, and the burden of proof is shifted, upon the challenger showing that "(1) the person alleged to have exerted undue influence had a confidential relationship with the testator; (2) the person actively participated in procuring the instrument's preparation or execution; and (3) the person would benefit unduly by the testamentary instrument." (*Rice v. Clark, supra*, 28 Cal.4th at p. 97.)

According to Mk.C., all of the elements necessary to raise a presumption of lack of mental capacity and undue influence by Diaz were established by undisputed evidence and, therefore, the trial court was obligated to shift the burden to Mw.C. to disprove undue influence and lack of capacity. (Mk.C. does not argue a presumption of undue influence arose as to Mw.C., L.C., or K.C.). We disagree with Mk.C.'s proposition that the facts pertaining to presumptions of undue influence and lack of capacity were undisputed. To the contrary, the facts and the evidence presented at trial

28

were highly disputed. Nonetheless, assuming for purposes of analysis only that the trial court misallocated the burden of proof, the error was harmless.

B. *Misallocation of the Burden of Proof in a Bench Trial*

Misallocation of the burden of proof in a bench trial is not reversible error per se and is deemed harmless if substantial evidence supports the trial court's express or implied findings. (*Navigators Specialty Ins. Co. v. Moorefield Construction, Inc.* (2016) 6 Cal.App.5th 1258, 1287 (*Navigators*); *Perez v. VAS S.p.A.* (2010) 188 Cal.App.4th 658, 679; see *In re Marriage of Burkle* (2006) 139 Cal.App.4th 712, 736 ["misallocation of the burden of proof . . . does not vitiate the substantial evidence rule"].) "[T]he question of the weight of evidence and the question of upon whom rests the burden of proof become purely academic when the trial court has found upon substantial evidence that the essential facts have been proved." (*Merrill v. Normandie Corp.* (1930) 110 Cal.App. 621, 623.)

In *Perez v. VAS S.p.A., supra*, 188 Cal.App.4th at page 679, the Court of Appeal concluded the trial court's failure to use the correct burden-shifting analysis was harmless because substantial evidence supported the express or implied findings on which the trial court based its decision. In *Navigators, supra*, 6 Cal.App.5th at pages 1287–1288, the Court of Appeal concluded the trial court's misallocation of the burden of proof was prejudicial because substantial evidence did not support an implied finding that was necessary to uphold the trial court's decision.

In *In re Marriage of Burkle, supra*, 139 Cal.App.4th at pages 717, 736, the appellant argued the trial court had erred by failing to apply a presumption of undue influence to the parties' postmarital agreement. The Court of Appeal concluded any error in misallocating the burden of proof was harmless because substantial evidence supported the trial court's finding

29

that any presumption of undue influence had been rebutted. (*Id.* at pp. 737–740.)

Error is harmless if "'it is reasonably probable that a result more favorable to the appealing party would [not] have been reached in absence of the error.'" (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800, quoting *People v. Watson* (1956) 46 Cal.2d 818, 836.) Here, there is no reasonable probability the trial court's decision would have been different had the court shifted the initial burdens of proof to Mw.C. because the court found, after considering all the evidence, that R.C. had the requisite mental capacity and was not subject to undue influence.

This was not a case that hinged on the allocation of the burden of proof for its resolution. Both Mw.C. and Mk.C. fully presented their evidence on the issues of undue influence and mental capacity. Had the trial court applied the presumptions of undue influence and lack of capacity and shifted the initial burden of proof to Mw.C., the court's decision would have been precisely the same because the court would have been presented with precisely the same evidence on which it based its decision. Whether the burden of proof was misallocated at trial therefore is an academic issue, and appellate review of the trial court's findings should be subject to the same substantial evidence standard applicable to any appeal from a judgment based on a statement of decision after a bench trial. (See *McPherson v. EF Intercultural Foundation, Inc.* (2020) 47 Cal.App.5th 243, 257.)

Citing *Estrada v. Royalty Carpet Mills, Inc.* (2022) 76 Cal.App.5th 685, 724, Mk.C. argues in his reply brief we must consider the weight of the evidence in determining whether any error in allocating the burden of proof is prejudicial. In *Estrada*, the Court of Appeal concluded that consideration of the weight of the evidence was appropriate because, based on

30

the record, the case was "close enough that there is a reasonable likelihood the failure to shift the burden affected the outcome." (*Ibid.*; see Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2023) ¶ 8:301, p. 8-221 ["if there was error in a 'close' case, the appellate court will *consider the weight of the evidence* in making the prejudicial error analysis"].)

This was not a close case. Nonetheless we shall consider the weight of the evidence. As we have concluded that the trial court should not have adjudicated the validity of documents Nos. 7–11, we limit our analysis of the weight of the evidence to documents Nos. 1–6, which are (1) the February 2018 Power of Attorney, (2) the February 2018 Revocation, (3) the Fifth Trust Amendment, (4) the May 2018 Exercise of Power of Appointment, (5) the May 2018 Survivor's Trust Resignation and Appointment, and (6) the May 2018 Family Trust Resignation and Appointment.

C. *The Weight of the Evidence Supports the Trial Court's Finding that R.C. Had the Requisite Mental Capacity*

1. Standards for Mental Capacity

The Probate Code sets out different standards for mental capacity: Section 6100.5 describes the standard of mental capacity for making a will; sections 810 through 812 describe the standards for mental capacity to enter into a contract or make other decisions. (*Andersen v. Hunt* (2011) 196 Cal.App.4th 722, 726–729 (*Andersen*).) More complicated decisions and transactions require greater mental function while less complicated decisions and transactions require less mental function. (*Lintz v. Lintz* (2014) 222 Cal.App.4th 1346, 1352.)

The May 2018 Exercise of Power of Appointment, although relating to a trust, is subject to the standard for testamentary capacity because it closely resembles a will or codicil. (*Andersen, supra*, 196

31

Cal.App.4th at p. 731.) The May 2018 Exercise of Power of Appointment is a relatively simple, one-page document, which in effect disinherits Mk.C. by removing him as a beneficiary of the Survivor's Trust. Documents Nos. 1–3, 5, and 6 are subject to the standard for mental capacity of Probate Code sections 810 through 812. Documents Nos. 1 and 2 are not testamentary in nature, and, while documents Nos. 3, 5, and 6 bear some testamentary characteristics, they are more complex than a will or codicil. (*Lintz v. Lintz, supra*, 222 Cal.App.4th at pp. 1352–1353.)

Under Probate Code section 6100.5, a person is mentally competent to make a will if the person (1) "[u]nderstand[s] the nature of the testamentary act"; (2) "[u]understand[s] and recollect[s] the nature and situation of the individual's property"; and (3) "[r]emember[s] and understand[s] the individual's relations to living descendants, spouse, and parents, and those whose interests are affected by the will." (Prob. Code, § 6100.5, subd. (a)(1).) Accordingly, "'[a] testator is of sound and disposing mind and memory if, at the time of making his will, he has sufficient mental capacity to be able to understand the nature of the act he is doing, and to understand and recollect the nature and situation of his property and to remember, and understand his relations to, the persons who have claims upon his bounty and whose interests are affected by the provisions of the instrument.'" (*Adams v. Superior Court* (1957) 49 Cal.2d 427, 432.)

Old age, feebleness, forgetfulness, filthy personal habits, personal eccentricities, failure to recognize old friends or relatives, physical disability, absent-mindedness, and mental confusion do not establish lack of testamentary capacity. (*Moore v. Anderson Zeigler Disharoon Gallagher & Gray* (2003) 109 Cal.App.4th 1287, 1300.)

32

Probate Code sections 810 through 812 set out the standard for mental capacity to make decisions, transact business, and enter into contracts. Probate Code section 810 creates a rebuttable presumption of mental capacity. Probate Code section 812[7] sets out the general standard that a person has mental capacity if the person has the ability to communicate the person's decision and has the ability to understand and appreciate (1) the rights, duties, and responsibilities created or affected by the decision; (2) the probable consequences for the decisionmaker and any persons affected by the decision; and (3) the significant risks, benefits, and reasonable alternatives involved in the decision.

Probate Code section 811 provides that a determination that a person lacks mental capacity must be supported by evidence of a deficit, and correlation between the deficit and decision, in at least one of the following mental functions: (1) alertness and attention; (2) information processing, including memory loss; (3) thought processes; and (4) ability to modulate mood and affect. (Prob. Code, § 811, subd. (a).) Any such deficit may be considered only if it "significantly impairs the person's ability to understand and appreciate the consequences of his or her actions with regard to the type of act or decision in question." (*Id.*, subd. (b).)

---

[7] Probate Code section 812 reads: "Except where otherwise provided by law, including . . . the statutory and decisional law of testamentary capacity, a person lacks the capacity to make a decision unless the person has the ability to communicate verbally, or by any other means, the decision, and to understand and appreciate, to the extent relevant, all of the following: [¶] (a) The rights, duties, and responsibilities created by, or affected by the decision[;] [¶] (b) The probable consequences for the decisionmaker and, where appropriate, the persons affected by the decision[; and] [¶] (c) The significant risks, benefits, and reasonable alternatives involved in the decision."

## 2. Evidence Regarding R.C.'s Mental Capacity

The weight of the evidence standard is synonymous with the preponderance of the evidence standard. (*Ettinger v. Board of Medical Quality Assurance* (1982) 135 Cal.App.3d 853, 858; see *Chamberlain v. Ventura County Civil Service Com.* (1977) 69 Cal.App.3d 362, 368 ["A decision which is contrary to the weight of the evidence is one which is contrary to the preponderance of the evidence"].) Here, there was more than a preponderance: The great weight of the evidence supports the trial court's finding that R.C. had the requisite mental capacity.

In assessing the weight of the evidence, we start with R.C.'s 2018 deposition, which the trial court found to have provided "good insight into her capacity and the dynamics of the situation." R.C.'s deposition provided evidence that she understood the nature and situation of her property and remembered her living relations. R.C. recalled and identified the names of her husband, children, and grandchildren. She knew she was living in her own house, the house was big, and she had a safe at home for valuables. She knew that she and her husband had started C. Bolt. R.C. said this litigation was creating "a mess."

R.C.'s deposition testimony shows too that R.C. had retained her memory and the ability to process information. (Prob. Code, § 811, subd. (a)(2), (3).) She testified she continued doing accounting work at C. Bolt and that she worked in the accounting office. She described the process by which bills are paid at C. Bolt and testified she did not sign checks just because she was handed them. She knew the year and testified she does not get confused about which day it is. Mk.C.'s attorney asked R.C. to remember the color "orange" at the beginning of the deposition. When asked to recall the color at the end of the deposition, R.C. correctly replied, "Orange."

34

All three of R.C.'s estate planning attorneys reached the conclusion that R.C. had the requisite mental capacity. As the trial court found, Wells, Walsh, and Albrecht, as R.C.'s estate planning attorneys, "met with [R.C.] . . . and had the opportunity to evaluate her mental capacity." Wells testified that on May 9, 2018, R.C. had capacity to execute the Fifth Trust Amendment, the May 2018 Survivor's Trust Resignation and Appointment, and the May 2018 Family Trust Resignation and Appointment. Wells and R.C. had a detailed discussion about R.C.'s concerns regarding Mk.C.'s litigation, who would control C. Bolt, and R.C.'s options to achieve her goals.

Wells testified his usual practice was to go over a document with the client and explain in layman's terms what it meant, and "odds are" he followed this practice with R.C. He also testified that at the May 30, 2018 meeting with R.C., he went through the documents and followed his usual practice of explaining in layman's terms the meaning of each.

Wells did testify that R.C. "should not be entering into financial transactions of any magnitude because she did have diminished capacity" and might not understand the consequences of what she was doing. It is apparent that Wells did not consider any of the documents R.C. signed to be a financial transaction of any magnitude.

Walsh testified that she explained to R.C. the February 2018 Revocation and the February 2018 Power of Attorney before she signed those documents. According to Walsh, R.C. understood the purpose of a power of attorney ("[s]he was very familiar with power of attorney") and "was very clear" in understanding it. Walsh testified that R.C. knew (1) she owned one percent of C. Bolt but 100 percent of voting rights, (2) Mk.C. and Mw.C. each owned 49.5 percent of C. Bolt, and (3) her net worth was $20 million. Walsh

35

found R.C. to be "much more engaged" than most of her elderly clients and that "[s]he absolutely understood what she was doing."

Walsh did testify that R.C. did not have capacity to make important decisions such as those needed to run C. Bolt, act as a manager, be on the board of directors, or be a trustee. It seems to us, however, that such capabilities are not necessarily equivalent to mental capacity to make a will or enter into a contract.

Albrecht testified that in April 2018 he believed R.C. had testamentary capacity to make the decision to disinherit Mk.C. Albrecht believed that R.C. was competent to act as trustee of her trusts and had mental capacity to understand multi-million dollar transactions involving the trust.

Feldman, who served as R.C.'s geriatric nurse and care manager from November 2017 to November 2019, found R.C. to be "inquisitive, enthusiastic, analytical." Feldman found R.C.'s thought process and questions to be "salient" and testified that R.C. would make a decision by collecting and evaluating data, asking questions, and obtaining opinions from trusted advisors. Feldman's testimony is evidence that R.C. was alert and attentive, she could reason logically, and her thinking was organized. (Prob. Code, § 811, subd. (a)(1), (2)(G), (3)(A).)

The court investigator testified that when he met with R.C. she appeared alert and oriented to time and place. (Prob. Code, § 811, subd. (a)(1)(B) & (C).) After interviewing R.C. in February 2018, the court investigator found that R.C. could make her own medical decisions, did not seem confused, fully understood the nature of the conservatorship proceedings, and did not want a conservatorship or Mk.C.'s appointment as a conservator.

Bonnie Olsen, Ph.D., was retained as an expert by Mw.C. and L.C. The trial court found Dr. Olsen to be "the most credible" witness regarding mental capacity and undue influence. Dr. Olsen has a Doctor of Philosophy in clinical psychology and specialized in geriatric care with an emphasis on dementia. She was affiliated with the University of California, Irvine (UCI) Alzheimer's Disease Research Center; worked at the Orange County Elder Abuse Forensic Center, which assists government agencies in protecting seniors; joined the University of Southern California medical school as vice chair of research for the department of family medicine; and worked for the United States Department of Justice to develop tools for courts in conservatorship cases.

Dr. Olsen was asked to investigate whether R.C. had mental capacity to execute the contested documents and whether she was a victim of undue influence. Dr. Olsen testified that R.C. had testamentary capacity in November 2017, including the capacity to execute all estate planning documents, and had retained that capacity as of April 2018, two months after R.C. signed documents Nos. 1 and 2, and one month before she signed documents Nos. 3–6.

In Dr. Olsen's first interview with R.C., in November 2017, Dr. Olsen found R.C.'s thought process to be linear, saw no evidence of delusions, and found R.C. to be socially appropriate, engaging, and happy. As part of her assessment of R.C., Dr. Olsen conducted three standardized tests to evaluate R.C.'s functioning. Dr. Olsen concluded, based on this testing, that R.C.'s responses were consistent with mild dementia but R.C. had the mental capacity to make testamentary decisions, including decisions regarding wills, trusts, and powers of attorney, so long as there was "some accommodation for her memory loss."

37

Dr. Olsen reassessed R.C. on April 3, 2018 at Walsh's request. Dr. Olsen concluded that R.C. had retained mental capacity to make testamentary decisions, including decisions regarding wills, trusts, and powers of attorney.

Dr. Olsen testified that in her opinion it was more likely than not that R.C. had the mental capacity to execute the May 2018 Exercise of Power of Appointment, the May 2018 Survivor's Trust Resignation and Appointment, and the May 2018 Family Trust Resignation and Appointment. Dr. Olsen was presented with hypothetical questions based on assumptions, supported by the testimony of Walsh and Wells, that the purpose, meaning, and effect of Documents 1–6 were explained to R.C. by counsel before she signed them. Dr. Olsen testified that given the accuracy of the assumptions, R.C. would have been given enough accommodation for her memory loss to have had mental capacity to execute those documents.

In August 2018, Dr. Olsen conducted a second reassessment of R.C. From the reassessment, Dr. Olsen concluded that there had been a decline in R.C.'s short-term memory and executive function, which was to be expected with advancing dementia. R.C. continued to have good abstract reasoning and judgment, and her concentration had improved somewhat. As of August 2018, R.C. did not have mental capacity for complex estate planning decisions. She retained capacity, however, to make simpler estate planning decisions, such as leaving her estate to one child to the exclusion of the other two.

Mw.C.'s other retained expert, David Sheffner, M.D., was board certified in Psychiatry by the American Board of Psychiatry and Neurology and is a clinical professor at the UCI School of Medicine, Department of Psychiatry. Dr. Sheffner testified that a diagnosis of dementia does not in

itself render a person mentally incompetent to understand a contract or make a will. In his opinion, R.C. had some cognitive impairment that did not interfere with her ability to execute documents Nos. 1–6.

Dr. Sheffner explained that in evaluating a person's capacity to make decisions that are task specific, he considers the person's alertness, ability to concentrate, orientation as to time, ability to communicate with others, and ability to reason and reach a conclusion. Dr. Sheffner interviewed R.C. twice in 2019; reviewed her January 2018 deposition transcript; reviewed the deposition transcripts of the court investigator, Feldman, Walsh, Albrecht, Wells, attorney Stephen Magro, Dr. Yang,[8] and Dr. Alva; and considered reports prepared by the court investigator and Dr. Olsen. Dr. Sheffner testified that R.C. had mental capacity in February 2018 to sign a power of attorney and in May 2018 to execute the Fifth Trust Amendment. Dr. Sheffner testified that at the time R.C. executed documents Nos. 1–6, she had the mental capacity to understand them if the purpose and effect of each were explained to her. Wells and Walsh testified they had explained to R.C. the purpose and effect of those documents before she signed them.

R.C. initially retained Magro to represent her in the Trust Proceeding. In July 2018, Magro prepared a declaration for R.C. in which she declared (1) she did not want Mk.C. to be a trustee of any trust in which she had an interest as a beneficiary; (2) she did not want Mk.C. involved in the management of C. Bolt; (3) she wished to resign as trustee of the Family Trust, the Marital Trust, and the Survivor's Trust; (4) she wanted Mw.C. to

---

[8] Jomon Yang, M.D., was R.C.'s primary care doctor since December 2017. Dr. Yang testified R.C. was somewhere between mild dementia and mild cognitive impairment, which did not change from December 2017 through July 2018.

succeed her as trustee of those trusts; (5) she did not trust Mk.C., whom she described as "too controlling" and "want[ing] to control me"; and (6) she was of sound mind. In her declaration, R.C. stated that the purpose and effect of the Fifth Trust Amendment, the May 2018 Survivor's Trust Resignation and Appointment, and the May 2018 Family Trust Resignation and Appointment was her resignation as trustee and appointment of Mw.C. as successor trustee to the Family Trust, the Marital Trust, and the Survivor's Trust. Magro testified he believed R.C. understood that by signing the declaration she was declaring all of those statements to be true under penalty of perjury.

R.C.'s declaration is evidence that R.C. (1) understood the nature of the acts she was undertaking (Prob. Code, § 6100.5, subd. (a)(1)(A)); (2) understood and appreciated the rights, duties, and responsibilities created or affected by the decision; and (3) understood and appreciated the probable consequences for the decisionmaker and any persons affected by the decision (*id.*, § 812, subds. (b) & (c)).

R.C. was able to effectively communicate her decisions and understood the probable consequences of her decisions for the persons affected by them. R.C. told Wells she had reconciled with K.C. and wanted her back in her estate and told Albrecht on April 27, 2018 that she wanted to disinherit Mk.C. In a meeting with Walsh on March 14, 2018, R.C. said she wanted to leave Mk.C. $1 because "he doesn't care what he does to others or hurts me." She told Walsh she wanted K.C. and Mw.C., mostly Mw.C., to run C. Bolt. On January 16, 2018, when Walsh and R.C. discussed who might serve as R.C.'s agent, R.C. said, "I don't want [Mk.C.]. He should have no authority."

The weight of the evidence established that R.C.'s decisions were logical and justified. (Prob. Code, § 812, subd. (b).) R.C. testified she did not

40

want Mk.C. to live with her because he was a bully, wanted to keep her under his thumb, and called R.C. names such as "bitch." R.C. testified that she was scared when Mk.C. "hollered" at her. She believed Mk.C. wanted to take control of her and control her assets. She told Wells in May 2018 she was "exceedingly upset" with Mk.C. because of his efforts to impose a conservatorship over her and seize control over C. Bolt. She was unhappy with Mk.C. due to the litigation he filed and told Wells that Mk.C. had gotten "too big for his britches." R.C. told Walsh that Mk.C. would yell at her all the time, call her stupid, and tell her to "shut the fuck up."

R.C. told the court investigator she was angry with Mk.C. for filing the conservatorship petition and she did not want Mk.C. to be her conservator because "[Mk.C.] is a very selfish and greedy person." R.C. also told the court investigator that "[Mk.C.] is very loud and threatening when he doesn't get what he wants" and that "[Mk.C.] will curse at me, he's called me a bitch many times."

In December 2018 a guardian ad litem was appointed for R.C. R.C. told her guardian ad litem that Mk.C. had called her a "bitch," belittled and made fun of her, and yelled at her. R.C. was afraid of Mk.C., feared he would put her in a home, and did not want him to have control over her or to make her decisions.

Wells testified that it is a common reaction for parents to become angry at children who seek to impose a conservatorship over them. The price those children pay for filing a conservatorship is often disinheritance. Mk.C. paid that price. The evidence also demonstrated that R.C. used disinheritance to express displeasure with a child's actions. When R.C. believed that K.C. was not treating her properly, R.C. disinherited her; when

41

R.C. was angry with Mk.C. for filing the Conservatorship Petition and mistreating her, R.C. disinherited him.

Dr. Olsen's testimony corroborated the testimony about Mk.C.'s treatment of R.C. and how that treatment led to her decision to disinherit him. R.C. told Dr. Olsen that Mk.C. was abusive and bullied her; had always been controlling, selfish, and self-serving; screamed at her; kept relatives away; made fun of her memory; stole things from her home; made her feel incapable; and always made people feel miserable. Dr. Olsen did not believe that others had created those feelings in R.C. R.C. told Dr. Olsen that Mw.C. was like her deceased husband, Mo.C.: honest, straightforward, trustworthy, and not just out to serve himself.

Mk.C.'s own actions are evidence that he believed R.C. had the mental capacity to enter into transactions, at least as of late 2017. Even though Mk.C. was aware of R.C.'s memory issues, in April 2017 he had R.C. loan him $150,000 and in May was making a proposal to have her buy his interest in C. Bolt. Mk.C. testified that as of October 2017, R.C. could make "very good cognitive decisions" when given "'all the information.'" Mk.C. testified that, despite having filed the Conservatorship Petition, in December 2017 he "begg[ed]" R.C. to buy his shares of C. Bolt.

The evidence supporting incapacity was not nearly as strong as the evidence of R.C.'s capacity. Dr. Lau, R.C.'s primary care physician from 2015 until sometime in 2017, testified that she believed R.C. "didn't have the capability to process enough information, and to remember it, to come up with the best decision for herself." Although in August 2017 Dr. Lau diagnosed R.C. as having "mild cognitive impairment" and "presenile dementia, with behavioral disturbance," at trial Dr. Lau disavowed having

42

ever diagnosed R.C. as having Alzheimer's disease or any other type of dementia.

In October 2017, Dr. Lau signed the form capacity declaration in which she stated that R.C. lacked capacity to give informed consent to any medical condition.[9] In this declaration, Dr. Lau checked boxes to indicate she had found that R.C. had "moderate" to "major" impairments as to (1) orientation as to time and situation; (2) ability to attend and concentrate; (3) memory, including short-term, long-term, and immediate recall; (4) ability to plan, organize, and carry out actions; and (5) ability to reason logically.

However, in March 2018, Dr. Lau signed a declaration by which she withdrew her consent to and approval of the capacity declaration from October 2017. At trial, Dr. Lau testified that she withdrew the October 2017 declaration because she did not have enough information at that time, and she did not want to get wrapped up in family dynamics. She also testified that nothing in the October 2017 declaration was untrue and she stood by it. But Dr. Lau also testified that her March 2018 declaration was correct and she had signed the October 2017 declaration at the insistence of Mk.C. and based on erroneous information he had provided her.

Mk.C. called one expert witness, Colin Koransky, Ph.D., to testify at trial. Dr. Koransky holds a master's degree in clinical psychology and a Doctor of Philosophy in neuroscience. Dr. Koransky testified that he conducted an independent medical examination (IME) of R.C. in November 2019, some 18 to 21 months after R.C. signed documents Nos. 1–6. A video recording of R.C.'s IME was played at trial.

---

[9] Dr. Alva, who signed the other capacity declaration, was retained by Mk.C. as a percipient expert but not called to testify at trial.

43

Dr. Koransky testified that in his opinion R.C. had testamentary capacity in 2018 but did not have mental capacity at that time to enter into a contract. Dr. Koransky testified, however, that R.C. had the mental capacity to give informed consent to the IME. Although Dr. Koransky saw R.C. in November 2019, he testified he could extrapolate back to reach conclusions about her mental capacity and susceptibility to undue influence in 2017 and 2018. He acknowledged that R.C.'s mental condition would have been worse in November 2019 than at the times she executed documents Nos. 1–6.

Dr. Koransky testified that R.C. did not have mental capacity to execute documents Nos. 1–6. In a series of questions, Dr. Koransky was asked whether R.C. would have had the mental capacity to execute those documents if the meaning and effect of each were explained to her. His responses were either "[o]n a basic level, yes" or "I don't know."

Dr. Koransky did not talk to or obtain information from Feldman, even though she brought R.C. to the IME. Dr. Koransky did not place much weight on the court investigator's opinion and did not know who R.C.'s guardian ad litem was. Dr. Koransky was given no information from Mk.C.'s other expert, Bennett Blum, M.D., whom Mk.C. did not call as a witness. Dr. Koransky testified that medical records are the starting point for rendering opinions as to capacity, but admitted he formed opinions about R.C.'s capacity before he had looked at a single medical record and based solely on her videotaped deposition.

Dr. Koransky testified that R.C. said during the IME that Mk.C. was the only family member with whom she was having difficulty, she wanted to keep control over the property she owns, and, while Mw.C. and K.C. would wait "until she drops dead," Mk.C. wanted her property now. R.C. did say she wanted to leave her estate in thirds to each child. When

44

Dr. Koransky asked whether R.C. wanted Mk.C. cut out of the will, R.C. stated, "I can live with [Mk.C.] being cut out of the will."

The testimony of Drs. Lau and Koransky does lend some support to a finding that R.C. lacked mental capacity at the time she executed documents Nos. 1–6. But such support is weak. Mk.C. also points to some purported infirmities in Dr. Olsen's testimony and testimony from Dr. Olsen and others that R.C. had dementia and poor memory, was sometimes confused, and could not enter into certain kinds of transactions. But the evidence which might support a finding that R.C. did not have mental capacity does not preponderate over the evidence that she did.

D. *The Weight of the Evidence Supports the Trial Court's Finding that R.C. Was Not Subject to Undue Influence*

A will or a trust may be set aside as void if it was procured by undue influence. (*David v. Hermann* (2005) 129 Cal.App.4th 672, 684; Prob. Code, § 6104.) "Undue influence is pressure brought to bear directly on the testamentary act, sufficient to overcome the testator's free will, amounting in effect to coercion destroying the testator's free agency." (*Rice v. Clark, supra*, 28 Cal.4th at p. 96.) The Elder Abuse and Dependent Adult Civil Protection Act defines undue influence as "excessive persuasion that causes another person to act or refrain from acting by overcoming that person's free will and results in inequity." (Welf. & Inst. Code, § 15610.70, subd. (a).) Considerations in determining whether a result was produced by undue influence include the victim's vulnerability, the influencer's apparent authority, the influencer's actions or tactics, and the equity of the result. (*Ibid.*)

The trial court found that "[R.C.] made her own decisions based on her own free will and for reasons that were logical and supported by the

evidence in the matter." As previously noted, Mk.C.'s contention that the court misallocated the burden of proof regarding undue influence extends only to Diaz. Thus, the weight of the evidence standard applies only to the trial court's findings regarding her. As to Mw.C., L.C., and K.C., the three others whom Mk.C. refers to as "the Influencers," the substantial evidence rule applies to the trial court's findings.[10]

There is no doubt that Diaz was hostile to Mk.C. and wanted R.C. to disinherit him. But Diaz's efforts to get Mk.C. disinherited had no effect. Nobody listened to her. Walsh testified that neither she nor R.C. did anything to remove Mk.C. from R.C.'s estate in response to Diaz's demands; as Walsh testified, "I don't take direction from [Diaz]." Walsh testified that Diaz played no role in procuring the February 2018 Power of Attorney and did not even know about it.

Diaz did not give Wells any instructions during R.C.'s meeting with him on May 9, 2018. Wells did not let Diaz participate in the preparation of any estate planning documents; he took no instruction from

_____

[10] In applying the substantial evidence standard, our task is to examine the entire record to determine whether there is evidence that is reasonable, credible, and of solid value to support the judgment. (*Ferguson v. Yaspan* (2014) 233 Cal.App.4th 676, 682.) We resolve all conflicts in the evidence in favor of the judgment, we do not reweigh the evidence, and we are bound by the fact finder's credibility determinations. (*Citizens Business Bank v. Gevorgian* (2013) 218 Cal.App.4th 602, 613.) The testimony of a single witness may constitute substantial evidence. (*Ibid.*) As a general rule, we consider the evidence and reasonable inferences supporting the judgment and disregard contrary evidence and inferences. (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 631.) "[T]he test is *not* the presence or absence of a substantial conflict in the evidence. Rather, it is simply whether there is substantial evidence in favor of the respondent." (*Dane Elec Corp., USA v. Bodokh* (2019) 35 Cal.App.5th 761, 770.)

Diaz, and "what was done were [his] recommendations to [R.C.] and were [his] handiwork." Diaz was silent throughout R.C.'s meeting with Wells on May 30, 2018.

For R.C.'s meeting with Albrecht on April 27, 2018, Diaz prepared written instructions for R.C. to tell him, "please remove [Mk.C.]'s name and his children from my estate planning documents that you prepared when my husband was alive and after his death." The instruction, if given, had no effect. Albrecht made no changes to R.C.'s estate plan and had suggested she think over the matter.

Wells testified there was no indication that R.C. was unduly influenced to execute the Fifth Trust Amendment, the May 2018 Survivor's Trust Resignation and Appointment, and the May 2018 Family Trust Resignation and Appointment. He had no reason to believe the changes made to R.C.'s estate plan were anything other than the product of her own free will. At the time Wells first met with R.C., Diaz said nothing and provided no estate planning ideas.

Both of Mw.C. and L.C.'s expert witnesses testified on the subject of R.C.'s susceptibility to undue influence. After meeting with R.C. and conducting assessments of her, Dr. Olsen saw no evidence of undue influence by Mw.C. Dr. Olsen testified that R.C. was "clear and decisive" about what she wanted: R.C. was "not someone who was easily pushed around." Dr. Olsen did not believe that anybody had planted R.C.'s estate planning wishes in R.C.'s head. Dr. Sheffner testified that in 2018, although R.C. had some "cognitive deficit," her susceptibility to undue influence was quite low.

Feldman testified that from November 2017 to November 2019 she saw no signs that Mw.C. or L.C. were exerting undue influence over R.C. Feldman described R.C. as someone not easily influenced by anyone: As

47

Feldman put it, R.C. was a powerful woman who was the "CEO of her domain" and was "in charge."

Evidence that R.C. had rational reasons for her estate planning decisions also supports a finding of lack of undue influence. We have reviewed in Section III.C.2, *ante*, the evidence of R.C.'s anger with Mk.C. for bringing the Conservatorship Petition and the Trust Petition, her distress over the way she treated him, and her use of disinheritance as a means of expressing displeasure with a child's behavior. This same evidence supports a finding that R.C. executed documents Nos. 1–6 based on her own free will and to carry out her wishes, and not as a result of undue influence.

The trial court considered the video recordings of R.C.'s deposition and found that in them she "was quite vocal about her views and what she wanted to do and why." In addition, we have reviewed the trial testimony of Mw.C., L.C., and K.C., and their testimony, viewed in light of the principles of substantial evidence standard of review, support the trial court's finding of no undue influence. We see no evidence that Mw.C., L.C., or K.C. controlled R.C.'s necessities of life or interactions with others, used affection, intimidation or coercion, or used haste or secrecy in initiating changes in R.C.'s estate plan. (Welf. & Inst. Code, § 15510.70, subd. (a)(3).)

Dr. Koransky testified that in his opinion, R.C. was susceptible to undue influence in 2017 and 2018. But Dr. Koransky's testimony must be considered in light of the fact he did not interview her until November 2019. Further, during the IME, R.C. displayed some of the indomitable characteristics noted by Dr. Olsen and others. While Dr. Koransky's testimony is some evidence to support Mk.C.'s claim of undue influence, the great weight of the evidence supports the trial court's finding. And, under a substantial evidence review pertinent to the undue influence claims against

48

Mw.C., L.C., and K.C., we need not consider Dr. Koransky's testimony at all. (*Howard v. Owens Corning, supra*, 72 Cal.App.4th at p. 631.)

## IV.

### THE STATEMENT OF DECISION SHOULD BE FILED IN THE CONSERVATORSHIP PROCEEDING

The trial court's statement of decision resolved matters in both the Conservatorship Proceeding and the Trust Proceeding, and it bears a caption with the names and case numbers for both. Yet, as Mk.C. points out, the statement of decision was not filed in the Conservatorship Proceeding, almost certainly due to clerical error. An appellate court has inherent power to correct a clerical error at any time. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185–186; *Estate of Eckstrom* (1960) 54 Cal.2d 540, 544.) We shall therefore direct the trial court to enter the statement of decision in the Conservatorship Proceeding.

### DISCUSSION: Mw.C. AND L.C.'S APPEAL

## I.

### BACKGROUND

After entry of the Conservatorship Judgment, Mw.C. and L.C. filed a memorandum of costs by which they sought $118,530.90. Mw.C., as the proposed conservator, filed a memorandum of costs by which he sought $599.60, and R.C. filed a memorandum of costs by which she sought $15,822.83. Mk.C. filed motions to strike Mw.C. and L.C.'s cost memorandum, Mw.C.'s cost memorandum, and R.C.'s cost memorandum. The trial court granted all motions.

In his appeal in No. G061621, Mw.C. argues the trial court erred by failing to make a determination of prevailing party in the Conservatorship Proceeding. In No. G061853, Mw.C. argues the trial court erred by granting

49

Mk.C.'s motions to strike Mw.C.'s, Mw.C. and L.C.'s, and R.C.'s memoranda of costs. Mw.C. argues he and R.C. are entitled as of right to recover costs pursuant to Code of Civil Procedure section 1032 because Mk.C. dismissed the Conservatorship Petition and the judgment in the Conservatorship Proceeding upheld the validity of the February 2018 Power of Attorney, the only matter remaining.

## II.

### MK.C.'S MOTION TO STRIKE MW.C. AND L.C.'S REPLY BRIEF

Before turning to the merits of Mw.C.'s appeal, we address Mk.C.'s motion to strike all or portions of Mw.C.'s reply brief. Mk.C. argues the reply brief should be stricken because it makes arguments and addresses issues outside the scope of Mw.C.'s appeal. Mw.C. filed opposition to the motion.

Mk.C.'s motion has merit. When, as in the present case, a party is both an appellant and a respondent, "[a] party must confine a reply brief, or a reply portion of a combined brief, to the points raised in its appeal." (Cal. Rules of Court, rule 8.216(b)(3).) The Advisory Committee comment to Rule 8.216(b) states, "[t]he purpose of subdivision (b)(3) is to ensure that in its reply brief a party addresses only issues germane to its own appeal. For example, a cross-appellant may not use its *cross-appellant's reply* brief to answer points raised in the *appellant's* reply brief." (Advisory Com. com., subd. (b) foll. Cal. Rules of Court, rule 8.216.)

Sections 2, 3, and 4 of Mw.C.'s reply brief violate California Rules of Court, rule 8.216(b)(3) by addressing matters and issues raised in Mk.C.'s appeal and, in effect, constitute a rebuttal to Mk.C.'s reply brief. Striking Mw.C.'s entire reply brief is unwarranted; instead, we order stricken sections 2, 3, and 4 of the reply brief.

## III.

### THE TRIAL COURT DID NOT ERR BY GRANTING MK.C.'S MOTIONS TO STRIKE COST MEMORANDA

In considering the merits of Mw.C.'s appeals, at the outset we point out a fundamental barrier to R.C. obtaining appellate relief: She did not file a notice of appeal. Because R.C. did not file a notice of appeal, we are without jurisdiction to afford her appellate relief. (*Conservatorship of Townsend* (2014) 231 Cal.App.4th 691, 700 ["'[o]nly a timely filed notice of appeal can invoke the jurisdiction of this court'"].)

At Mk.C.'s request, the trial court dismissed Mk.C.'s amended Conservatorship Petition without prejudice. With dismissal of the Conservatorship Petition, the only matter left in the Conservatorship Proceeding was R.C. and Mw.C.'s petition by which they sought a determination that R.C. had revoked the 2016 Power of Attorney and that the February 2018 Power of Attorney was valid and in full force and effect. The Conservatorship Judgment upholds the validity of the February 2018 Power of Attorney and three other documents signed by R.C.

Given those results, Mw.C. argues he is the prevailing party and entitled as of right to recover costs pursuant to Code of Civil Procedure section 1032. But a conservatorship is a proceeding under the Probate Code. (See Prob. Code, §§ 1820, 1821.) Probate Code section 1002, not Code of Civil Procedure section 1032, governs the allocation of costs in matters under the Probate Code. Probate Code section 1002 provides: "Unless it is otherwise provided by this code or by rules adopted by the Judicial Council, either the superior court or the court on appeal may, in its discretion, order costs to be paid by any party to the proceedings, or out of the assets of the estate, as justice may require." Thus, "although Code of Civil Procedure section 1032, subdivision (b) entitles a prevailing party in ordinary civil litigation to costs

51

as a matter of right, the probate court retains discretion to decide not only whether costs should be paid, but also, if they are awarded, who will pay and who recover them." (*Holloway v. Edwards* (1998) 68 Cal.App.4th 94, 99.)

The trial court in this case exercised its discretion not to award costs to Mw.C. The trial court struck from the Conservatorship Judgment a proposed finding that R.C. and Mw.C. were the prevailing parties and entitled to recover costs from Mk.C.

Judge Belz rather than Judge Salter ruled on Mk.C.'s motions to strike  costs in the Conservatorship Proceeding. On September 15, 2022, Judge Belz issued a minute order[11] in which he cited Probate Code section 1002 and concluded that costs in a probate proceeding "must be provided for in a judgment or order." Judge Belz found: "The Memorandum of Costs seeks an award of costs in connection with the petition tried to the court. . . . The matter was submitted to the court for decision. The court filed a Judgment on April 22, 2022. The Judgment does not specifically address the issues before the court in these motions. There was no provision in the Judgment for costs to the prevailing party. The Memorandum of Costs is ineffective and inadequate to support any award of costs against Moving Parties."

The record thus establishes that, in entering the Conservatorship Judgment, the trial court , per Judge Salter, exercised its discretion under Probate Code section 1002 to not find that Mw.C. was the prevailing party and to decline to award him costs. Because the Conservatorship Judgment did not include a provision for costs, Judge Belz did not err by granting

---

[11] On our own motion, we take judicial notice of the September 15, 2022 minute order, which was attached to the notification of filing notice of appeal in No. G061853 transmitted to us by the trial court. (Evid. Code, §§ 452, subd. (d), 459, subd. (a).)

52

Mk.C.'s motions to strike costs memoranda. (*Estate of McCormack* (1969) 2 Cal.App.3d 492, 499–500.)

## DISPOSITION

The trial court is directed to modify the statement of decision by deleting lines 12–22 on page 4 and lines 1–11 on page 7. The trial court is directed to file the modified statement of decision in the Conservatorship Proceeding, Orange County Superior Court Case No. 30-2017-00946366.

The trial court is directed to modify the Conservatorship Judgment by deleting lines 22–26 on page 1 and lines 1–2 on page 2, and to modify the Trust Judgment by deleting lines 22–23 on page 1. The trial court is directed to enter the modified judgments nunc pro tunc.

As modified, the Conservatorship Judgment and the Trust Judgment are affirmed. The order granting Mk.C.'s motions to strike Mw.C. and L.C.'s cost memorandum and Mw.C.'s cost memorandum is affirmed. Mw.C. may recover costs on appeal in Nos. G061621 and G061629. Mk.C. may recover costs in No. G061853.


SANCHEZ, J.

WE CONCUR:


MOORE, ACTING P. J.


GOODING, J.


53